**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| COURTNEY MARTIN, | CASE NO. 3:22-CV-01115-JJH |
| Plaintiff, | DISTRICT JUDGE JEFFREY J. HELMICK |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE AMANDA M. KNAPP |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Courtney Martin ("Plaintiff" or "Ms. Martin") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Child Disability Benefits ("CDB") and Disability Insurance Benefits ("DIB"). (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **VACATED** and that the case be **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation. On remand, the ALJ should: (1) provide a full and accurate explanation of the evidence and reasoning that forms the basis for her findings as to the paragraph "B" criteria Listings 12.04, 12.06, and/or 12.15, including clear and complete consideration of Ms. Martin's treatment records with the RHC Psychiatry Clinic through December 31, 2018; (2) reassess whether Ms.

1

Martin meets the specified Listings in light of that analysis; and (3) provide a full and accurate explanation of the evidence and reasoning that forms the basis for her mental RFC limitations.

## I.  Procedural History

On December 17, 2018, Ms. Martin filed applications for CDB and DIB.  (Tr. 340-48.) She alleged a disability onset date of July 21, 1994.  (Tr. 106, 126.)  She alleged disability due to speech disorder (stuttering), out toeing due to femoral retroversion, anxiety, depression, post-traumatic stress disorder ("PTSD") (*Id*.)  Ms. Martin's applications were denied at the initial level (Tr. 124, 144) and upon reconsideration (Tr. 166, 186), and she requested a hearing (Tr. 223-24.)  On July 16, 2019, a hearing was held before an Administrative Law Judge ("ALJ"). (Tr. 55-89.)

## II.  Evidence

### A.  Personal, Educational, and Vocational Evidence

Ms. Martin was born in 1994 and was 0 years old on the alleged disability onset date; on December 31, 2018, the date last insured, she was 24 years old, making a younger individual under Social Security regulations.  (Tr. 26.)  She had at least a high school education.  (*Id*.)  Ms. Martin had not engaged in substantial gainful activity since July 21, 1994, the alleged onset date, and was unable to perform past relevant work.  (Tr. 20, 26.)

### B.  Medical Evidence

#### 1.  Relevant Treatment History

##### i.  Mental Health Treatment

On July 24, 2012, Ms. Martin participated in an intake assessment with Sandra Antis, LMSW, at The Progressive Guidance Center of Monroe for her mental health.  (Tr. 504.)  She was 18 years old and reported anger outbursts and trouble concentrating.  (Tr. 506-07.)  On

examination, she exhibited anger, slow memory, and "hard" concentration, but appeared neat and demonstrated clear thought processes, above average intelligence, good speech and insight, and "ok" behavior, mood/affect, impulse control, orientation, and judgment.  (Tr. 506.)  Ms. Martin reported taking Trileptal and Strattera until age 16, but said she had not been on mental health medications for two years; she wished to restart mental health treatment.  (*Id*.)  In her intake forms, Ms. Martin reported that she had attempted suicide or serious self-harm in 2009, including cutting, hanging herself, and suffocating; she also reported recent thoughts of self-harm.  (Tr. 514.)

Ms. Martin returned to counseling with LMSW Antis on August 2, 2012, where she reported taking steps to start a job and apply for student financial aid.  (Tr. 504.)  She wanted to begin Trileptal and Strattera to control her anger and help her concentrate.  (*Id.*)

On August 14, 2012, Ms. Martin underwent a psychiatric evaluation for depression with psychiatrist Mubeen Memon, M.D.  (Tr. 525-26.)  On examination, she was well groomed, cooperative, goal oriented, fully oriented, with intact memory and fair insight.  (Tr. 526.)  She presented as depressed but denied suicidal ideas.  (*Id.*)  Dr. Memon diagnosed bipolar disorder with a history of ADHD, ordered lab testing, and prescribed cognitive behavioral therapy.  (*Id.*)

Ms. Martin did not return to therapy until January 8, 2013, where she saw M. Hatcher, LMSW.  (Tr. 505.)  She reported that Dr. Memon could not complete his medication assessment until after she had started Methazole for a new thyroid diagnosis.  (*Id.*)  Ms. Martin indicated she wanted to continue therapy and set her treatment goals.  (*Id.*)  Treatment goals included reducing her symptoms of depression, reducing crying spells, and reducing her anger outbursts.  (Tr. 510.)

Ms. Martin returned to Dr. Memon for a psychiatric follow up on January 21, 2013, reporting that she had been seen by a neurologist and prescribed medication for hyperthyroidism.

(Tr. 528.)  She reported doing well now but having daily mood swings.  (*Id.*)  On examination, she was engageable and cooperative with good eye contact, okay mood, appropriate affect, and intact insight and judgment; she denied suicidal ideations.  (*Id.*)  Dr. Memon again diagnosed bipolar disorder with a history of ADHD.  (*Id.*)  He started her on a trial of Trileptal.  (*Id.*)

Ms. Martin attended weekly appointments with LMSW Hatcher on January 22, January 29, and February 5, 2013.  (Tr. 519-20.)  On January 22, LMSW Hatcher engaged in active listening while Ms. Martin discussed her history of sexual abuse and resulting anger and regret.  (Tr. 519.)  On January 29, 2013, Ms. Martin reported she had started her mental health medications.  (*Id.*)  LMSW Hatcher noted Ms. Martin had made progress in using her coping strategies, particularly with her anger issues.  (*Id.*)  On February 5, 2013, Ms. Martin reported she was less controlled by her anger, was better able to tolerate stress, had increased stability, and was focusing on enrolling in college.  (Tr. 520.)

Ms. Martin returned to see Dr. Memon on February 4, 2013.  (Tr. 527.)  She reported doing "slightly better" with fewer mood swings and less irritability, no suicidal thoughts, and no medication side effects.  (Tr. 527.)  Her examination findings were consistent with her January office visit.  (Tr. 527-28.)  Her diagnosis and medications were unchanged.  (Tr. 527.)

At a therapy visit with LMSW Hatcher on February 19, 2023, Ms. Martin reported reduced outbursts, reduced anxiety, increased self-control, and looking forward to starting college in July.  (Tr. 520.)  However, on March 12, 2013, she reported increased agitation and irritability.  (Tr. 524.)  LMSW Hatcher indicated the change might be hormone related, observed that Ms. Martin was able to identify her behavior and control outbursts, and noted she was to see her psychiatrist soon.  (*Id.*)  On April 16, 2023, LMSW Hatcher observed that Ms. Martin had

4

made progress in reducing her anger outbursts and appeared calmer and more relaxed.  (*Id.*)  Ms. Martin reported that her medications were helping and talked about college issues.  (*Id.*)

Ms. Martin returned to Dr. Memon for medication management on April 20, 2013.  (Tr. 529.)  Her mental status findings were consistent with her prior office visits.  (Tr. 527-29.)  She reported no medication side effects, fewer mood swings, less irritability, and "okay" sleep.  (*Id.*)  Dr. Memon increased Ms. Martin's Trileptal dosage, recommended follow up in four weeks, and indicated she should continue with therapy.  (*Id.*)

On April 30, 2013, Ms. Martin reported to LMSW Hatcher that she was feeling more stable and was focusing on going to college in October.  (Tr. 521.)  She felt the medications were helping with her anger outbursts and was excited about college.  (*Id.*)  She returned for a therapy visit with LMSW Antis on May 21, 2013.  (Tr. 522.)  She reported outbursts when she was off of her medications, but not if she stayed on her Trileptal.  (*Id.*)  She had a babysitting job planned for the summer and planned to attend a phlebotomy program in October.  (*Id.*)

Ms. Martin attended a medication management appointment with Dr. Memon on June 12, 2013.  (Tr. 530.)  Dr. Memon noted she was doing well on medication and continued her current medications.  (*Id.*)  Ms. Martin returned to therapy with LMSW Antis on July 18, 2013.  (Tr. 522.)  She reported she was babysitting for spending money and planning to leave for her career program in October.  (*Id.*)  She also reported having blood work and an EKG to see if she could have ADHD medications due to trouble concentrating.  (*Id.*)  This is the last therapy visit of record at The Progressive Guidance Center of Monroe.

At a medication management visit with Dr. Memon on August 14, 2013, Ms. Martin reported she was unable to concentrate.  (Tr. 531.)  On examination, she remained engageable and cooperative with good eye contact, okay mood, appropriate affect, and intact insight and

judgment; she denied suicidal ideations.  (*Id.*)  Her EKG was within normal limits, and Dr. Memon noted she wanted to be medically cleared to start Strattera.  (*Id.*)  Her diagnosis remained the same.  (*Id.*)  Dr. Memon continued her Trileptal and started Strattera.  (*Id.*)

She returned for medication management on September 3, 2013, where she reported she was doing well on her medications and able to concentrate.  (Tr. 532.)  Her mental status findings remained the same.  (Tr. 531-32.)  Dr. Memon continued her Trileptal, but increased her Strattera dosage and ordered labs.  (Tr. 532.)

At her next medication management visit on October 1, 2013, she reported no medication side effects, no OCD symptoms, and no suicidal ideation.  (Tr. 533.)  Her mental status examination findings remained the same and Dr. Memon continued her medications at the same dosage.  (*Id.*)  At her medication management visit on December 2, 2013, she reported she was doing well on medication, that the medication was helping her, and that she was able to concentrate and able to finish tasks.  (Tr. 534.)  Her mental status examination findings remained the same and Dr. Memon continued her medications at the same doses.  (*Id.*)  This is the last medication management visit of record at The Progressive Guidance Center of Monroe.

Three years later, on September 14, 2016, Ms. Martin attended a physical and ADHD evaluation with Shalini Niranga, M.D., at the Family Medicine Center.  (Tr. 701-04.)  She reported following previously with Dr. Memon and being stable on Trileptal and Strattera, but being off those medications since 2013.  (Tr. 702.)  She complained of trouble concentrating, being easily distracted, and being unable to relax and wait her turn.  (*Id.*)  She could not cope with her work and was recently laid off.  (*Id.*)  On examination, she displayed good judgment, normal mood and affect, full orientation, and normal memory.  (Tr. 703.)  Self-report screening

was positive for ADHD, bipolar disorder, and anxiety.  (*Id.*)  Dr. Nirangan provided a psychiatric

referral and recommended that Ms. Martin follow up with psychiatry.  (*Id.*)

On September 13, 2017, Ms. Martin presented to the emergency department at Mercy

Health for a possible asthma attack and anxiety.  (Tr. 742.)  Ms. Martin reported that she was

taking Celexa and Effexor, but felt they were making her feel suicidal; she stopped taking Celexa

three days prior and Effexor one day prior.  (*Id.*)  She said she had attempted to talk to her doctor

about these medications but was told to keep taking them.  (*Id.*)  Mental status findings were

normal.  (Tr. 743.)  She felt improved with 1 mg of Ativan.  (Tr. 744.)  The final impression was

substance or medication-induced anxiety disorder with onset during withdrawal, and Ms. Martin

was discharged with a prescription for Ativan.  (Tr. 745.)

Ms. Martin reported to the emergency department at Oakwood Southshore Medical

Center the next day with a new onset of stuttering, and was admitted for two days.  (Tr. 578-605;

649-73.)  Her family reported she had started Lamictal and Effexor three weeks before, but had

stopped Effexor suddenly due to suicidal ideations, after which she became nonresponsive and

short of breath; she was treated with Ativan at an emergency room the day before.  (Tr. 584.)

Mental status findings in the emergency room were normal except for a flat affect and "stuttering

effect to speech with no word salad, no specific disarticulation otherwise."  (Tr. 592-93, 654.)  A

CT of her head was negative for acute process and it was observed that she may be having

significant side effects due to recently started Lamictal.  (Tr. 594, 603, 656.)

On a psychiatric consult, Daniel Blake, Ph.D., noted normal mental status findings, a

history of self-harm, sporadic treatment with a therapist, and that Ms. Martin was on psychiatric

medications.  (Tr. 582-83.)  Dr. Blake indicated psychological regression should be ruled out as a

contributor to her limited speech, but that she was not an imminent threat to herself or others and

7

was not a candidate for inpatient psychiatric treatment. (Tr. 583.) Neurological examination findings were also normal, except that she "stutters with every word." (Tr. 585-86.) Neurologist Christopher Whitty, M.D., Ph.D., observed there was no issue with word finding or comprehension, only with forming words. (Tr. 583.) An MRI of her brain was negative for acute process. (Tr. 604.) An EEG with EKG was performed to rule out seizure; the EEG was normal. (Tr. 582, 586, 605.) Dr. Whitty opined that the new onset stuttering was more likely related to psychiatric causes and less likely related to medications. (Tr. 586.)

Ms. Martin returned to the emergency department at Mercy Health on November 10, 2017, complaining of shortness of breath, cough, and anxiety after skipping her usual nightly dose of Zoloft. (Tr. 748-54.) She was given Benadryl and took the Zoloft pill she had with her. (Tr. 751.) Twenty minutes later, she was "virtually asymptomatic" and reported feeling much better. (*Id.*) She was diagnosed with anxiety and discharged. (*Id.*)

On November 28, 2017, Ms. Martin attended an office visit with Donald Hickey, M.D., at Family Medicine Center for an annual physical and to follow up on her September hospital visits. (Tr. 697-700.) She reported she used to be on Effexor and Lamotrigine, which worsened her symptoms, leading to her hospital admission for anxiety and panic attacks. (Tr. 698.) She reported being on Zoloft from the Cedar Creek Church Free Clinic for four to six weeks, and that her anxiety and panic attacks had improved. (*Id.*) She also reported taking Ativan as needed from Beaumont Hospital for panic attacks. (*Id.*) She was working on getting established with a psychologist. (*Id.*) Her mental status examination findings were normal. (Tr. 699.) Dr. Hickey found her to be a low risk for suicide, discussed a safety plan, and instructed her to call if symptoms worsened. (Tr. 700.) He diagnosed Major Depressive Disorder, single episode, severe without psychotic features. (*Id.*)

Ms. Martin returned to see Dr. Niranjan at Family Medicine Center on February 28, 2018 for follow up regarding anxiety. (Tr. 691-94.) She reported that she was still trying to get established with a psychiatrist since her last visit. (Tr. 693.) She had been taking Zoloft since November 2017, but was having panic attacks twice per month. (*Id.*) Her mental status findings reflected a sad mood, and sad and flat affect, but were otherwise normal. (*Id.*) Dr. Niranjan diagnosed anxiety, increased Ms. Martin's Zoloft dosage, and provided a referral to a different psychiatric provider for management of her mood disorder. (Tr. 693-94.)

Ms. Martin established care with Phoung Cao, M.D., at the RHC Psychiatry Clinic on March 14, 2018. (Tr. 1369-75.) She complained of persistent excessive anxiety, difficulty controlling her worry, impaired concentration, irritability, one to two panic attacks per month, and frequent stuttering, which caused her to quit her job in telecommunications. (Tr. 1371.) She reported past incidences of self-harm, but said she reduced them by tattooing herself or her fiancé when she felt the need to cut herself. (*Id.*) On examination, she demonstrated slowed behavior, avoidant eye contact, anxious mood, restricted affect, and soft, slow, halting speech with a stutter. (Tr. 1374.) Dr. Cao noted that the stuttering seemed to improve when Ms. Martin spoke passionately or angrily, and that it decreased toward the end of the interview. (*Id.*) Dr. Cao diagnosed posttraumatic stress disorder, generalized anxiety disorder, major depressive disorder, and increased her dosage of Zoloft. (Tr. 1375.) He counseled her on the need to discontinue or decrease the use of benzodiazepines, and to continue psychotherapy twice weekly for CBT to address symptoms of anxiety. (*Id.*) He also diagnosed hypersomnia and provided a sleep medicine referral. (*Id.*)

On the same day, Ms. Martin attended a therapy session with Maria Walters, SWT, for anxiety and depression. (Tr. 1375-78.) SWT Walters observed that Ms. Martin was disheveled

and slouched with a stutter, but other mental status findings were normal.  (Tr. 1378.)  She provided therapeutic interventions and advised Ms. Martin to return in two weeks.  (*Id.*)  Ms. Martin returned to see SWT Walters on March 26 and March 28, 2018.  (Tr. 1362-68.)  Mental status findings were the same.  (Tr. 1364-65, 1368.)

Ms. Martin returned to the Family Medicine Center on March 28, 2018 for a follow-up on anxiety with David Weldy, M.D., Ph.D.  (Tr. 686-90.)  She reported recently establishing with University of Toledo ("UT") psychiatry and seeing UT psychology for counseling sessions. (Tr. 689.)  She said she was compliant with medications with no side effects.  (*Id.*)  Mental status findings were largely normal, but she presented as sad and anxious, with a flat affect and "speech stuttered, which is chronic."  (*Id.*)  She was continued on Zoloft for anxiety but advised to follow up with UT psychiatry/psychology for recommendations regarding anxiety.  (Tr. 690.)

Ms. Martin attended further therapy sessions with SWT Walters on April 3, April 10, April 24, and April 30, 2018. (Tr. 1348-62.)  She returned for a medication management office visit with Dr. Cao on May 2, 2018.  (Tr. 1344-48.)  She complained of sadness, generalized worry, nightmares, and two panic attacks per month, but reported that her anxiety and the frequency of her panic attacks had improved, and that she had fewer intrusive thoughts and nightmares.  (Tr. 1346.)  Her stuttering remained the same.  (*Id*.)  On examination, her mood continued to be anxious, her affect restricted, and her behavior slowed, but her speech was more lively and her stuttering appeared to have improved since the last visit; the stutter also improved when she spoke to the young child in the room with her.  (Tr. 1347.)  Dr. Cao diagnosed anxiety and insomnia, continued her Zoloft, started her on trazodone, referred her for a sleep study, and advised her to continue psychotherapy.  (Tr. 1347-48.)

On May 7, 2018, Ms. Martin attended an emergency therapy session with Lora Spurling, MSW, LISW, CCTP, due to feeling depressed and having suicidal thoughts.  (Tr. 1340-43.)  She reported a very stressful week with babysitting and a wedding, leading to a "mental breakdown" where she engaged in cutting; she described cutting as "the most protective of the options she could think of in the moment."  (Tr. 1342.)  If she tattooed she would only put something negative on her body, so she cut instead.  (Tr. 1343.)   On examination, she was depressed, anxious, tearful, and slouched, with speech at a normal volume and pitch but exhibiting a stutter.  (*Id.*)  She was instructed to follow up with LISW Spurling in three days.  (*Id.*)

She returned to see LISW Spurling on May 10, 2018.  (Tr. 1337-40.)  On examination, she had an anxious mood and a stutter, but findings were otherwise normal.  (Tr. 1340.)  Therapeutic interventions addressed reducing the frequency of her babysitting.  (Tr. 1339.)  She noted upcoming activities like a girls' day, going to church with friends, and going to Bike Week with her fiancé.  (*Id.*)  She was instructed to follow up in a week.  (*Id.*)

She returned to see LISW Spurling on May 16, 2018.  (Tr. 1333-36.)  Her examination findings were unchanged.  (Tr. 1336.)  She did some babysitting, but then told her friend that she could not do it anymore and the conversation went better than expected.  (*Id.*)  She noted that her dog was one of her biggest protective factors, and that she worried he would die soon.  (*Id.*)  She and LISW Spurling discussed other protective factors and how to prepare for the loss of her dog.  (*Id.*)  She was instructed to return in a week.  (*Id.*)

She followed up with LISW Spurling on May 22, 2018.  (Tr. 1330-1333.)  Ms. Martin discussed her application for disability and the barriers she encountered to maintaining employment, and LISW Spurling reported that Ms. Martin's stutter severely increased her anxiety levels and made it not possible for her to work.  (Tr. 1332.)  On examination, Ms. Martin

was dysphoric and anxious with a stutter, but all other findings were normal.  (Tr. 1333.)  Ms. Martin was instructed to return in one week.  (Tr. 1332.)

Ms. Martin returned to therapy with LISW Spurling on May 31 and June 7, 2018, with similar mental status findings.  (Tr. 1323-29.)  Her mental status findings were notably changed in a therapy visit on June 11, 2018, where she was slouched, reserved, withdrawn, anxious, depressed, tearful, with a soft voice and a stutter, with moderately impaired social judgment, and had suicidal ideation with no intent.  (Tr. 1319-22.)  She was told to return in three days.  (Tr. 1322.)  Her mental status findings were improved when she returned on June 14, 2018, where her voice remained soft with a stutter, she reported "slight" suicidal thoughts, and displayed mild impairments in social judgment, but her mood was euthymic and "hopeful" and other clinical findings were normal.  (Tr. 1315-19.)  She next attended therapy with LISW Spurling on June 21, 2018, where she presented as anxious and fearful, with a soft voice and a stutter. (Tr. 1312-15.)  Therapeutic interventions focused on preparing for an upcoming medical appointment with a male gynecologist in light of her past trauma.  (Tr. 1314.)  She returned to therapy on July 5, 2018, but the therapy notes appear to mirror her June session. (Tr. 1308-12.)

Ms. Martin returned for medication management with Dr. Cao on July 9, 2018. (Tr. 1303-08.)  She reported that her anxiety and PTSD symptoms had worsened due to triggers, including interaction with a male gynecologist; she reported increased intensity and frequency of flashbacks, now twice per week.  (Tr. 1306.)  She also reported an increase in panic attacks, from twice per month to five times per month, and that her stuttering had worsened.  (*Id.*)  She also reported worsening depression, with pervasive sadness most days and increased frequency of suicidal ideation, with her most recent thoughts of "not wanting to be around" two days before.  (*Id.*)  On examination, she was slouched, with slowed behavior, depressed and anxious mood,

labile affect, and speech that was soft and stuttering (improved when talking to her boyfriend) and spontaneous and lively (more lively when interacting with her boyfriend). (Tr. 1307.) Dr. Cao diagnosed posttraumatic stress disorder, conversion disorder, major depressive disorder, generalized anxiety disorder, borderline personality traits, cannabis use disorder, alcohol use disorder – in remission, and ruled out attention deficit hyperactivity disorder. (Tr. 1308.) He continued her sertraline and trazodone at current doses, added clonidine for anxiety and PTSD, and instructed her to return in six weeks. (*Id.*)

Ms. Martin attended therapy sessions with LISW Spurling on July 13, 2018 (Tr. 1300-03), July 23, 2018 (Tr. 1296-1300), July 26, 2018 (Tr. 1293-96), August 1, 2018 (Tr. 1289-93), and August 8, 2018 (Tr. 1285-89). On July 13, LISW Spurling raised the possibility of addressing PTSD symptoms in therapy. (Tr. 1302.) Ms. Martin said she was not ready but would consider it soon. (*Id.*) Her examination findings continued to be normal with the exception of an anxious and fearful mood and soft stuttering speech. (Tr. 1304.) On July 23, her social judgment was mildly impaired and she practiced grounding. (Tr. 1299.) On July 26, Ms. Martin used grounding techniques and talked about self-harm. (Tr. 1295.) On examination, she had a stutter and demonstrated mildly impaired social judgment and suicidal ideation without a plan. (Tr. 1296.) Her examination findings on August 1 were similar, except that her mood was dysphoric and irritable. (Tr. 1292.) Therapeutic interventions were focused on grounding techniques and alternatives to self-harm. (*Id.*) On August 8, her mood was again euthymic, but she continued to demonstrate a stutter and suicidal ideation without a plan. (Tr. 1288.) Ms. Martin remained open and engaged during the session. (*Id.*)

Ms. Martin returned for medication management with Dr. Cao on August 13, 2018. (Tr. 1280-85.) She reported that her depressive symptoms continued to be bad since her last visit,

with pervasive sadness most days, low energy, poor concentration, guilt, sleep disturbances.  (Tr. 1283.)  She reported chronic suicidal ideation, and that she held a knife to her wrist the prior week but was able to stop herself and walk away; she denied current suicidal ideation.  (*Id.*)  She reported that her anxiety symptoms had somewhat improved with clonidine, but that she had dizziness and orthostatic hypertension at a higher dose.  (*Id.*)  On examination, she had a slouched posture, slowed behavior, soft speech with a stutter, and an anxious and depressed mood; findings were otherwise normal.  (Tr. 1284.)  Dr. Cao continued sertraline and trazodone at current doses but decreased clonidine and instructed her to return in six weeks.  (*Id.*)

Ms. Martin attended additional therapy sessions with LISW Spurling on August 13, 2018 (Tr. 1276-80), August 17, 2018 (Tr. 1273-76), August 22, 2018 (Tr. 1269-73), August 28, 2018 (Tr. 1266-69), September 5, 2018 (Tr. 1261-65), September 11, 2018 (Tr. 1257-61), and September 20, 2018 (Tr. 1254-57).  On August 13, Ms. Martin reported having suicidal thoughts four to seven days per week, and was using distraction techniques to cope.  (Tr. 1279.)  On examination, she was dysphoric and anxious, stuttered, demonstrated suicidal ideation with no intent, had difficulty maintaining attention for long periods of time, and had mildly impaired social judgment.  (Tr. 1280.)  She had similar examination findings on August 17, August 22, August 28, September 5, September 11, except that her attention and concentration was intact. (Tr. 1260, 1264, 1269, 1272, 1276.)  On September 20, her examination reflected that her mood was dysphoric, she stuttered, she displayed suicidal ideation with no intent, and that she had moderately impaired social judgment.  (Tr. 1257.)  She remained open and engaged.  (*Id.*)

Ms. Martin returned for medication management with Dr. Cao on September 24, 2018. (Tr. 1249-54.)  Ms. Martin reported that she had discontinued clonidine entirely due to dizziness and orthostatic hypotension even at the reduced dose.  (Tr. 1251.)  Her depression and anxiety

14

symptoms remained unchanged since the last visit, with her depression symptoms continuing to be severe. (*Id.*) She endorsed pervasive sadness most days, low energy, poor concentration, guilt, and sleep disturbances. (*Id.*) She reported chronic suicidal ideation, without current suicidal ideation, and reported that she engaged in self-harm by cutting in the past week, to relieve some of her anxiety and mood symptoms. (*Id.*) She also reported worsening anxiety symptoms since discontinuing clonidine, with continued flashbacks and avoidance. (*Id.*) On examination, she continued to have a slouched posture, with speech that was soft and halting with a stutter, depressed and anxious mood, and chronic intermittent suicidal ideation without current suicidal ideation, intent, or plan. (Tr. 1252.) Dr. Cao continued her prescriptions for sertraline and trazodone, formally discontinued clonidine, and instructed her to return in eight to ten weeks. (Tr. 1253.)

Ms. Martin attended additional therapy sessions with LISW Spurling on September 25, 2018 (Tr. 1245-48), October 2, 2018 (Tr. 1241-45), October 12, 2018 (Tr. 1237-41), October 16, 2018 (Tr. 1234-37), October 18, 2018 (Tr. 1230-34), and October 22, 2018 (Tr. 1226-30). On September 25, her examination reflected a slouched posture, a cooperative but guarded attitude, soft speech with a stutter, dysphoric mood, suicidal ideation with no intent, and moderately impaired social judgment. (Tr. 1248.) Her examination findings on October 2 had improved, with a euthymic mood, speech at a normal volume, and no suicidal ideation, but her posture remained slouched, she had a stutter, and her insight and social judgment were mildly impaired. (Tr. 1244.) She was irritable and anxious on October 12, but examination findings were otherwise similar. (Tr. 1241.) She reported difficulty concentrating that week. (Tr. 1240.) On October 16, her examination again reflected suicidal ideation with no plan. (Tr. 1237.) She discussed improvement with some PTSD triggers and said she was open to addressing PTSD

more in therapy.  (*Id.*)  On October 18, she reported thoughts of hurting herself and not wanting to feel like this any longer.  (Tr. 1233.)  Her examination was similar, except that she was also initially guarded.  (*Id.*)  On October 22, she endorsed suicidal thoughts and reported trying to jump out of a moving car the day before.  (Tr. 1229.)  On examination, she was slouched, guarded, depressed, anxious, and tearful, with a constricted and tearful affect, suicidal ideation, mildly impaired insight, moderately impaired social judgment, and stuttering speech.  (*Id.*)  LISW Spurling helped to make arrangements for a hospital admission.  (*Id.*)

On October 22, 2018, Ms. Martin was admitted to the hospital after a suicide attempt. (Tr. 784-816.)  She had attempted to jump out of a moving car twice after her dog passed away. (Tr. 784.)  She also reported self-harm and plans for another suicide attempt that included cutting herself, jumping out of a moving car, or getting hit by a train.  (Tr. 784, 788.)  On admission, she was alert and oriented but withdrawn with a stutter, depressed mood, suicidal ideation and plans, and superficial cuts to the left forearm.  (Tr. 785-86.)  She was noted to have a speech impediment and use a notebook to write things down when her stuttering got bad.  (Tr. 788, 791.)  A page in her notebook included statements about how she hated herself and should have killed herself.  (Tr. 788.)  Safety checks on October 23 noted her to be crying and refusing to speak or acknowledge others.  (Tr. 792.)  A morning shift note observed her to be isolating, disheveled, anxious, depressed, sad, hopeless, and helpless with a flat affect and disorganized thoughts; she was compliant with ADLs but did not attend group.  (Tr. 793.)  She reported daily marijuana use, with increased use recently and a desire to quit.  (Tr. 798.)  An evening shift note observed her to be isolating with a depressed mood, but appropriate appearance, calm affect, and logical thought processes; she was compliant with ADLs but did not attend group sessions despite invitations and encouragement from staff.  (Tr. 800.)

A morning shift note on October 24 observed Ms. Martin was social with her peers, with an appropriate mood and affect and logical thought processes; she was compliant with medications and attended group. (Tr. 805.) Kenneth Adler, M.D., conducted a psychiatric examination that day, observing Ms. Martin had a bright affect and her thinking was well organized; she denied suicidal thoughts. (Tr. 806.) The evening shift note observed she was present in the day area and social with peers, her appearance was appropriate, her mood anxious, and her affect calm and flat. (Tr. 808.) A morning shift note on October 25 observed that Ms. Martin was social with her peers and had a pleasant mood and an affect that brightened on approach. (Tr. 812.) She was discharged on October 25, 2018. (Tr. 816.)

Ms. Martin attended therapy sessions with LISW Spurling on October 26, 2018 (Tr. 1223-26), October 30, 2018 (Tr. 1219-23), November 6, 2018 (Tr. 1216-19), November 7, 2018 (Tr. 1212-16), and November 13, 2018 (Tr. 1208-12). On October 26, Ms. Martin reported a lesson learned in a hospital group, and was able to identify some positive things she had done in her life. (Tr. 1225.) On examination, her posture was slouched, her behavior was slowed, her speech was soft and stuttered, and her mood was anxious; findings were otherwise normal. (Tr. 1226.) On October 30, Ms. Martin expressed interest in a referral to speech therapy again. (Tr. 1222.) Her examination findings were similar, except that her mood was also dysphoric, she was self-deprecatory, her social judgment was mildly impaired, and she had difficulty with focus at times during the session. (*Id.*) Her examination findings on November 6 and November 7 were similar, except that her attention and concentration were intact. (Tr. 1215, 1218.) On November 7, she reported hearing suicidal thoughts but did not wish to act on them. (Tr. 1215.) On November 13, her examination findings remained the same and she was introduced to CPST

17

worker Nora Evarts, QBHS, to assist with scheduling speech therapy and working through her disability application.  (Tr. 1206-08, 1211.)

Ms. Martin returned for medication management with Dr. Cao on November 19, 2018. (Tr. 1200-06.)  She reported that her mood was somewhat better, with feeling less depressed and improvement in her stuttering.  (Tr. 1203.)  She continued to have intermittent hopelessness and thoughts of self-harm (cutting), but did not act on the thoughts of self-harm.  (*Id.*)  She continued to endorse poor concentration, nightmares, hyperarousal, flashbacks, and panic attacks.  (*Id.*)  On examination, she continued to have a slouched posture, slowed behavior, depressed and anxious mood, and suicidal ideation with no intent, but her stutter was reduced from prior appointments. (Tr. 1204.)  He continued medications at their current doses, including sertraline, trazodone, and Abilify.  (*Id.*)  He noted that he would consider Strattera for ADHD and prazosin for PTSD and future visits.  (*Id.*)  She was advised to continue with psychotherapy and return in six to eight weeks, sooner if needed.  (*Id.*)

Ms. Martin attended additional therapy sessions with LISW Spurling on November 19, 2018 (Tr. 1197-1200), November 26, 2018 (Tr. 1191-94), December 4, 2018 (Tr. 1187-91), and December 10, 2018 (Tr. 1183-87).  On November 19, LISW Spurling observed that Ms. Martin's posture was slouched, she was unsteady (reporting feeling lightheaded), her stutter showed some improvement, and she remained self-deprecatory.  (Tr. 1200.)  By November 26, the only abnormal mental status findings noted by LISW Spurling were a slouched posture and a stutter with some improvement.  (Tr. 1193-94.)  However, examination findings on December 4 also noted a dysphoric, anxious, and fearful mood and suicidal ideation with no plan.  (Tr. 1190.) Examination findings on December 10 were similar, but also noted mildly impaired insight and social judgment.  (Tr. 1186.)

Ms. Martin returned for medication management with Dr. Cao on December 17, 2018. (Tr. 1178-83.)  Since her last visit, Ms. Martin reported acute stressors due to spending time with her family during the holidays, but said her mood was better overall.  (Tr. 1181.)  She reported feeling sad and down three days per week, improved from before, and sometimes felt hopeless and like life was not worth living when her family picked on her.  (*Id.*)  She denied current thoughts of self-harm or suicidal ideation.  (*Id.*)  On examination, she continued to have a slouched posture and slowed behavior, but her stutter and affect were improved from prior appointments, and she was smiling more.  (Tr. 1182.)  Dr. Cao continued her medications, referred her for psychological testing to rule out ADHD and personality disorders, advised her to coordinate care with Ms. Evarts for a speech therapy referral for stuttering, to continue psychotherapy, and to return in ten to twelve weeks.  (*Id.*)

Ms. Martin attended therapy sessions with LISW Spurling on December 20, 2018 (Tr. 1174-78) and December 31, 2018 (Tr. 1168-71).  At both sessions, her examination findings reflected a slouched posture, stutter with some improvement, and mildly impaired insight.  (Tr. 1171, 1177.)  Ms. Evarts met with her on December 21 to discuss possible volunteer opportunities, her disability application, and her referral for speech therapy. (Tr. 1171-74.) There are additional mental health treatment records in the evidentiary file, but those records post-date the applicable date last insured of December 31, 2018.

## ii.    Physical Health Treatment

Ms. Martin attended an outpatient visit with James W. Roach, M.D., at the Shriners Hospital for Children on February 17, 2016, complaining of right lower extremity calf pain.  (Tr. 538-40.)  Dr. Roach noted that she was previously seen and evaluated in January 2016 for bilateral calf pain focal to her Achilles.  (Tr. 538.)  The prior evaluation was negative for

significant concerns, and a prior ultrasound for deep vein thrombosis was also negative; Ms. Martin had been given instructions for physical therapy.  (*Id.*)  Ms. Martin had then visited an emergency room for right ankle pain.  (Tr. 538-39.)  X-rays were negative, but she was instructed to return to Shriners for repeat evaluation due to a significant exacerbation.  (Tr. 539.)  On examination, Dr. Roach noted Ms. Martin was severely distressed and tearful, and that any provocative maneuver or light palpation anywhere about the ankle elicited extreme pain and discomfort.  (*Id.*)  However, the examination findings were otherwise normal with a fully intact Achilles tendon.  (*Id.*)  Dr. Roach found there was no indication of any pathological cause for the significant pain given that x-rays were negative and physical examination revealed a full, normal, and intact Achilles tendon.  (*Id.*)  An MRI was ordered for further evaluation.  (*Id.*)

On March 16, 2017, Ms. Martin reported to the emergency department at Mercy Health complaining of right calf pain after starting to work out again and "doing a lot of stair jumps." (Tr. 718.)  Her physical examination findings were normal, except for tenderness to the right calf.  (Tr. 719-20.)  X-rays were negative and Ms. Martin was referred to orthopedics.  (Tr. 721.) She was diagnosed with a right calf strain and discharged.  (*Id.*)

Ms. Martin presented to the emergency department at Promedica Flower Hospital in the morning on August 7, 2017, complaining of left knee pain that "feels like the knee is slipping in and out of place."  (Tr. 832.)  Physical examination findings were normal.  (Tr. 833.)  She was discharged with prednisone and instructions to follow up with primary care.  (Tr. 834.)

That evening, Ms. Martin presented to Promedica Urgent Care Holland, complaining of right calf pain after walking all around the zoo that day.  (Tr. 818.)  She rated her pain at seven on a ten-point scale and reported no relief with NSAIDs and heat.  (*Id.*)  On examination, she exhibited decreased range of motion of the right ankle with mild Achilles tendon pain and

tenderness to the right lower leg, but all other findings were normal. (Tr. 820.) She was diagnosed with strain of the right calf muscle, provided a Norflex injection, and prescribed a Medrol dosepack and Flexeril. (*Id.*) She was instructed to follow up with primary care if her symptoms did not improve. (*Id.*)

On September 12, 2018, Ms. Martin attended a follow up appointment for pelvic pain with Maria Luisa Corpuz, M.D., at the Family Medicine Center. (Tr. 929-34.) She reported being seen by a gynecologist who believed it was "bladder spasm," but did not follow up with that provider because she preferred a female provider. (Tr. 932.) She also reported a history of polycystic ovary syndrome ("PCOS"); she was taking spironolactone and had started oral contraceptive pills, but could not remember to take them. (*Id.*) On examination, she was morbidly obese with hypertonicity, tenderness, tenderness-to-palpation around the left iliac crest, and rash, erythema, and healing induration on the right anterior thigh; all other physical examination findings were normal. (Tr. 932.) Mental status findings were normal except for a sad mood and sad/flat affect. (*Id.*) Dr. Corpuz diagnosed chronic interstitial cystitis, folliculitis, pelvic pain, myalgia/myositis, and contraception care. (Tr. 933.) She referred Ms. Martin to urology for possible bladder spasm, prescribed ibuprofen for myalgia and doxycycline for folliculitis, and started Ms. Martin on a birth control patch in connection with PCOS. (*Id.*)

Ms. Martin attended an appointment with Michelle Lajiness, N.P., at the Regency Urology Clinic on September 25, 2018 for a new patient evaluation. (Tr. 926-29.) Physical examination findings were normal. (Tr. 928-29.) NP Lajiness diagnosed dyspareunia, finding Ms. Martin had no signs of interstitial cystitis, sent her for physical therapy, and instructed her to return in three months. (Tr. 929.) Ms. Martin returned for a follow-up with NP Lajiness on December 19, 2018. (Tr. 922-26.) Ms. Martin reported that she had just started therapy. (Tr.

21

923.)  Ms. Martin also reported that they determined the pain was coming from her hip, and that

she was continuing with physical therapy and had been referred to orthopedics.  (Tr. 925.)

Examination findings were normal and NP Lajiness did not recommend any further action.  (*Id.*)

On February 11, 2019, a month and a half after her date last insured, Ms. Martin attended

an appointment with David Sohn, M.D., at the MP Orthopaedics Clinic, complaining of bilateral

hip pain.  (Tr. 919-22.)  She reported being born with a birth defect of externally rotated femurs

which has put stress on her hips all her life.  (Tr. 921.)  She reported the pain was sharp, located

in her groin, and rotated around the sides of her legs, and that walking had become unbearable.

(*Id.*)  On examination, she was obese with tenderness of the bilateral hip flexor muscles, limited

range of motion in the bilateral hips, and 4/5 strength in the bilateral hips.  (Tr. 921-22.)  Dr.

Sohn indicated that Ms. Martin appeared to have bilateral hip labral tears, psoas tendinitis, and

sacroiliac joint inflammation.  (Tr. 922.)  X-rays did not show significant degenerative joint

disease, CAM lesions, or pincer lesions.  (*Id.*)  Dr. Sohn ordered a right hip MRI for evaluation

of possible labral pathology and instructed Ms. Martin to return to discuss the results.  (*Id.*)

The next day, Ms. Martin saw primary care provider Dr. Corpuz for a yearly checkup.

(Tr. 915-19.)  On examination, she was morbidly obese with a body mass index ("BMI") of 52.1,

with tenderness and limited range of motion and tenderness-to-palpation of the left iliac crest; all

other findings were normal.  (Tr. 917-18.)  Dr. Corpuz diagnosed morbid obesity, urinary

incontinence, and a toothache.  (Tr. 918.)  Dr. Corpuz believed the incontinence was due to stress

incontinence and obesity; she recommended kegel exercises.  (*Id.*)

An MRI of the right hip was completed on March 8, 2019, and showed joint effusion,

possible proximal IT band friction posteriorly near the gluteus maximus and gluteus medius

muscles, and could not exclude an anterosuperior labral tear.  (Tr. 984-85.)  She attended follow

22

up orthopedic visits with Dr. Sohn on March 19 and April 22, 2019.  (Tr. 1400-07.)  In March, Dr. Sohn ordered an MR arthrogram of the right hip to confirm the diagnosis of right hip labral tear.  (Tr. 1406.)  In April, he noted that the MRI with arthrogram had confirmed the clinical suspicion for right hip labral tear with femoroacetabular impingement, and offered Ms. Martin a right hip labral repair with osteoplasty.  (Tr. 1403.)

On May 8, 2019, Ms. Martin had a right hip arthroscopy, labral debridement and osteoplasty of CAM lesion.  (Tr. 1437-38.)  She attended post-operative visits with Dr. Sohn at Waterville Orthopedics on May 20 and June 14, 2019.  (Tr. 1394-99.)  At the May visit, Dr. Sohn advised that she could progress to weight-bearing as tolerated and begin physical therapy. (Tr. 1399.)  Her post-operative physical examination findings were normal at both visits, but she reported in June that her physical therapy was causing progressively worse pain in the right sacroiliac joint.  (Tr. 1396, 1399.)  Dr. Sohn referred her to pain management for consideration of a sacroiliac joint injection.  (Tr. 1396.)

### 2. Opinion Evidence

#### i. Physical Work Performance Testing

On August 1, 2016, Ms. Martin underwent a physical work performance test conducted by Lynne Chapman, MS, OTR/L.  (Tr. 1036-38.)  She presented to the evaluation with a non-weightbearing boot on her right lower extremity due to new onset tendinitis and plantar fasciitis. (Tr. 1036.)  She had been participating in outpatient physical therapy for six to eight weeks and completed bilateral heel cord stretches daily, and was instructed to wear the boot on her right until she progressed to increased weightbearing on her right foot.  (*Id.*)  Ms. Martin reported that she had recently lost three jobs due to pain in both feet, right more than left.  (*Id.*)

Ms. Chapman assessed Ms. Martin as being able to perform light work as defined by the U.S. Department of Labor in the Dictionary of Occupational Titles throughout an eight-hour workday, based on test findings regarding dynamic strength, position tolerance, and mobility. (Tr. 1037.) She found Ms. Martin to be able to lift twenty pounds floor to waist occasionally, carry fifteen pounds occasionally, push fifty pounds occasionally, pull forty pounds occasionally, sit frequently, stand occasionally, never reach overhead, climb stairs, or climb a ladder; she could occasionally bend, kneel, squat, or crawl. (*Id.*) She was limited by her pain in both feet, right greater than left. (*Id.*) Ms. Chapman recommended Ms. Martin follow through with her psychiatrist and she complete current outpatient physical therapy to wean herself from the boot. (Tr. 1038.) Ms. Chapman also recommended Ms. Martin contact Opportunities for Ohioans with Disabilities to determine if she is a candidate for supported employment services. (*Id.*)

Ms. Martin also underwent a physical work performance evaluation on May 5, 2020, conducted by Lisa Melville, OTR/L. (Tr. 1806-11.) Ms. Melville found Ms. Martin capable of sustaining light work for an eight-hour workday. (Tr. 1806.) She also recommended Ms. Martin follow up with Opportunities for Ohioans with Disabilities for job re-training. (Tr. 1810.)

### ii. State Agency Reviewers

State agency physician, Rebecca Neiger, M.D., reviewed Ms. Martin's record on June 28, 2019. (Tr. 117-20.) She concluded that Ms. Martin had limitations consistent with a range of light exertional work, with additional limitations including occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching, and crawling, never climbing ladders/ropes/scaffolds, and avoiding all exposure to hazards. (Tr. 119.) State agency psychologist David Dietz, Ph.D., reviewed the record and found that Ms. Martin had moderate limitations in understanding, remembering, and applying information; interacting with others; concentrating, persisting, or

maintaining pace; and adapting or managing oneself.  (Tr. 115-16.)  He concluded that Ms. Martin was capable of completing simple tasks in a setting that does not have frequent or significant changes in job duties/routines and where there are no stringent time or production requirements; she also could relate superficially with others in a setting that did not require collaboration for task completion.  (Tr. 121.)

On reconsideration in October 2019, state agency physician Mehr Siddiqui, M.D., concurred with Dr. Neiger's assessments at the initial level.  (Tr. 156-63.)  However, state agency psychologist Mary Hill, Ph.D., found Ms. Martin slightly more limited in mental functioning than Dr. Dietz and opined she would be limited to 1-3 step tasks, superficial interactions, no conflict resolution, and a static environment where change is explained and gradually introduced. (Tr. 162-63.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

At the hearing on May 18, 2021, Ms. Martin testified that she was 4'11" and weighed 270 pounds.  (Tr. 61.)  She lived in a mobile home with her fiancé.  (*Id.*)  Ms. Martin stated that she experienced hip pain when she walked up stairs and used a ramp to get into her home.  (Tr. 61-62.)  She had attempted college but had flunked out and did not complete a degree.  (Tr. 62.)  She did, however, complete a certificate program and became a certified nursing assistant.  (Tr. 63.)  She had a valid driver's license and did not experience problems driving.  (*Id.*)  She testified she could shower but had a hard time bathing or doing tasks that required her to lift her leg, such as putting on pants or socks.  (Tr. 64.)

Ms. Martin's past work included making sandwiches at Subway.  (*Id.*)  She also worked as a part-time telephone sales representative for six months.  (Tr. 65.)  She worked for two weeks

as a part-time food demonstrator but had to quit because she was on her feet too much.  (Tr. 65-66.)  She also had past full-time work as a CNA, where she was on her feet for three-fourths of the day and lifted up to 100 pounds when shifting patients.  (Tr. 66.)  The ALJ instructed the Vocational Expert to estimate that Ms. Martin lifted 150 pounds in this role, as an estimation of an average person's weight.  (Tr. 67.)

Ms. Martin testified to disabling conditions since birth.  (*Id.*)  She was born with a birth defect in which her hips, knees, and ankles were not properly aligned, worsening over the years. (*Id.*)  She had her Achilles tendons stretched on both feet when she was six, and hip surgery on both hips.  (*Id.*)  The hip surgeries have not resolved her pain.  (Tr. 67-68.)  She has also attempted physical therapy without relief.  (Tr. 68.)  Ms. Martin testified to having issues walking, squatting, stooping over, bending, and lifting.  (*Id.*)

She also testified to mental health issues that included schizoaffective disorder, stuttering, anxiety, depression, and PTSD.  (*Id.*)  She experienced voices telling her to harm herself.  (*Id.*) She also had difficulty with motivation and procrastinating.  (Tr. 69.)  She was in weekly counseling services and took a number of medications for her mental health conditions.  (*Id.*) Ms. Martin testified that the medications "help a little bit" but that she still had to do a lot of work to cope.  (*Id.*)  She also experienced pain in her hips and heels.  (*Id.*)  Sitting, hot showers, and ice helped the pain.  (*Id.*)  She could walk for about twenty minutes at most before needing to sit down for ten or twenty minutes.  (Tr. 69-70.)  She could lift about 25-30 pounds.  (Tr. 70.) On a typical day, she would play online multiplayer video games, do housework, socialize with friends, and would sometimes just sit in silence.  (Tr. 70-72.)  Ms. Martin said she required assistance with completing household chores such as laundry, dishes, and with showering.  (Tr. 72.)  She took care of three cats and a dog with her fiancé's assistance.  (Tr. 74.)

26

Since having a major anxiety attack in 2017, Ms. Martin reported she has had a stutter, which has caused her difficulty in social roles. (Tr. 76.) Her stutter improved with speech therapy. (Tr. 76-77.) She explained that her fiancé was unable to understand a word she said before she had speech therapy. (Tr. 77.)

Ms. Martin testified that three or four times per week she was unable to do household chores, such as cooking meals, and relied on her fiancé to complete these tasks. (*Id.*) She also reported being unable to get out of bed due to depressive symptoms one or two times per month. (Tr. 78.) She also isolated herself from other members of her household a couple of times per month. (Tr. 79.) She reported difficulty sitting for long periods of time, and said she needed to shift position after 45 minutes. (Tr. 80.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified that a hypothetical individual of Ms. Martin's age, education and work experience and the functional limitations described in the ALJ's RFC determination could not perform Ms. Martin's prior work, but could perform representative positions in the national economy, including housekeeping cleaner, office helper, or garment sorter. (Tr. 83-84.) He also testified that if the person would either be off task 25% of the work day, would need to lie down outside of scheduled breaks, or would be absent more than two days per month, that would preclude competitive employment. (Tr. 85-86.) If the individual needed to have an isolated environment up to a third of the day, that would be considered a special accommodation and would be work preclusive. (Tr. 87.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

In her June 15, 2021 decision, the ALJ made the following findings:[1]

1.    Born in 1994, the claimant had not attained age 22 as of July 21, 1994, the alleged onset date (20 CFR 404.102 and 404.350(a)(5)).  (Tr. 20.)

2.    The claimant met the insured status requirements of the Social Security Act through December 31, 2018.  (*Id.*.)

3.    The claimant has not engaged in substantial gainful activity since July21, 1994, the alleged onset date.  (*Id.*)

4.    Prior to attaining age 22 through December 31, 2018, the date last insured, the claimant had the following severe impairments: depression, anxiety, attention deficit hyperactivity disorder (ADHD), posttraumatic stress disorder (PTSD), bipolar disorder, schizoaffective disorder, morbid obesity, exercise-induced asthma, obstructive sleep apnea, psychogenic stuttering and bilateral foot deformity.  (*Id.*)

5.    Prior to attaining age 22 through December 31, 2018, the date last insured, the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. 21.)

6.    The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can have occasional exposure to dust, odors, fumes and other pulmonary irritants. She should not push or pull with the right lower extremity. She can occasionally climb ramps and stairs but never climb ladders, ropes and scaffolds. She can occasionally stoop, kneel, crouch and crawl. She is to avoid all exposure to workplace hazards such as unprotected heights, dangerous moving machinery and can do no commercial driving. The claimant is also limited to performing simple, routine and repetitive tasks, but not at a production rate pace, for example, no assembly line work. She is limited to making simple work-related decisions. She is limited to no team or tandem tasks. She is limited to responding appropriately to occasional interaction with supervisors, coworkers, and is to have no contact with the general public. She can occasionally use the telephone. (Tr. 23.)

---

[1] The ALJ's findings are summarized.

7.    Prior to attaining age 22, through December 31, 2018, the date last insured, the claimant was unable to perform any past relevant work.  (Tr. 26.)

8.    The claimant was born in 1994 and was 0 years old on the alleged onset date. On December 31, 2018, the date last insured, she was 24 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  (*Id*.)

9.    The claimant has at least a high school education.  (*Id*.)

10.   Transferability of job skills is not material to the determination of disability.  (*Id*.)

11.   Prior to attaining age 22, through December 31, 2018, the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including housekeeping cleaner, office helper, and garment sorter.  (Tr. 26-27.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from prior to July 20, 2016 when she attained age 22, through December 31, 2018, the date last insured.  (Tr. 27.)

## V.     Plaintiff's Arguments

1.    The ALJ erred when she failed to find at Step Three of the Sequential Evaluation that Ms. Martin satisfied the criteria of Listing 12.04 and/or 12.15.

2.    The ALJ's RFC was not supported by substantial evidence as she failed to properly evaluate the evidence documenting the combination of Ms. Martin's severe impairments.

(ECF Doc. 7, p. 1.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651

(6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      First Assignment of Error: Whether ALJ Erred in Finding Ms. Martin Did Not Satisfy the Criteria of Listings 12.04, 12.06, and/or 12.15.**

Ms. Martin contends that the ALJ erred in finding she did not meet the criteria of Listings 12.04, 12.06, and/or 12.15 at Step Three of the sequential analysis.  (ECF Doc. 7, pp. 11-19.) She argues first that her symptoms meet the "A" criteria for all three listings and second that she demonstrated either two "marked" or one "extreme" limitation in the "B" criteria.  (*Id.* at pp. 14-15.)  The Commissioner responds that the record reflects "when engaged in mental health care, [Ms. Martin]'s treatment was mostly effective in alleviating her symptoms" and "the ALJ's decision was consistent with the findings of the state agency medical experts."  (ECF Doc. 8, p. 1.)  She argues the ALJ reasonably determined the record supported only "moderate" levels of impairment and no medical expert found "marked" limitations in functioning.  (*Id.* at pp. 8-10.)

At Step Three, a claimant will be found disabled if her impairment meets or medically equals one of the listings in the Listing of Impairments. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a).

The Listings at issue here relate to the following mental disorders: depressive, bipolar and related disorders (12.04); anxiety and obsessive-compulsive disorders (12.06); and trauma- and

stressor-related disorders (12.15).  C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06, 12.15.  All three Listings incorporate identical paragraph B and paragraph C criteria, which is an analysis used to rate the severity of mental impairments in four general areas of functioning.  *See* 20 C.F.R. §§ 404, 416.  Paragraph B defines four broad mental functional areas: "Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself," and requires that a claimant show extreme limitation in one area, or marked limitation in two areas in order to meet a Listing.  20 C.F.R. § 416.920a(c)(3), *see also* 20 C.F.R. § 404, Subpt. P, App. 1, 12.00E.  The Commissioner does not challenge Ms. Martin's argument that the A criteria are met in this case, so the discussion will focus on the B criteria.

Ms. Martin argues the ALJ erred in finding she had moderate limitations in the B criteria areas of functioning because she was "seriously limited in her ability to interact with others (stuttering), her ability to maintain concentration or persistence or pace (exhibited poor concentration and fatigue), and her ability to adapt or manage oneself (suicidal ideation and thoughts)."  (ECF Doc. 7, p. 16.)  She asserts her "counseling and psychiatric sessions provided uncontroverted evidence that [she] was seriously limited in her ability to perform these activities on a sustained and full-time basis."  (*Id.*)  Because the ALJ failed to discuss much of the relevant evidence, including extensive medical records predating her date last insured, Ms. Martin argues the ALJ "erroneously failed to properly recite the relevant evidence and failed to provide sufficient information so this Court can facilitate meaningful review."  (*Id.* at pp. 15-17.)

The ALJ provided the following analysis in support of her findings regarding Ms. Martin's level of limitation in the three challenged "B" criteria functional areas, with citations to evidentiary support for each finding:

> In interacting with others, the claimant has a moderate limitation. Talking increases her levels anxiety due to stuttering, making it difficult to make appointments over

the telephone (Exhibit 8E/3). Treatment records reflect a history of mood swings and anger outbursts (Exhibit 1F). However, she can superficially relate with others in a setting that does not require collaborative efforts for task completion (Exhibit 1A). The residual functional capacity herein incorporates limitations in interaction with others in the workplace and telephone conversations.

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. She reports difficulty maintaining concentration and completing tasks (Exhibit 8E/8), flashbacks, avoidance and other residual symptoms related to PTSD (Exhibit 11F/76). The residual functional capacity assessed provides restrictions to address the claimant's ability to focus attention on work activities and stay on task at a sustained rate.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. Treatment not[e]s consistently identify mild impairment of insight and social judgment (Exhibit 11). She contends with psychogenic stuttering that reportedly increases with stress. The residual function capacity herein provides for the claimant's limitation in regulating emotions, controlling behavior and responding to demands in the workplace by requiring a stable and predictable work setting.

(Tr. 22-23.)

Ms. Martin argues this assessment does not adequately evaluate the evidence and explain the ALJ's conclusions as it fails to address the relevant medical evidence and the waxing and waning of symptoms. (ECF Doc. 7, pp. 16-18.) She focuses on the ALJ's limited discussion of her treatment with the RHC Psychiatry Clinic in 2018. (*Id.* at p. 16; *see also* Tr. 1168-1383 (RHC records through 12/31/18).) The ALJ provided the following discussion of those records:

She had unsuccessfully tried to establish care for mental health treatment, taking Zoloft from a free clinic and Ativan as needed for panic attacks so <u>her primary care doctor referred her to University of Toledo for management of mood disorder (Exhibit 6F/13) where she saw a psychiatrist in March 2018. Main concerns were anxiety with panic attacks, depression and stuttering. Speech was soft, slow, halting and stuttered. Stuttering seemed to improve when talking about something passionately or angrily, and decreased toward the end of the initial interview. The examining psychiatrist diagnosed PTSD, generalized anxiety disorder and major depressive disorder, prescribed medications and recommended individual therapy (Exhibit 11F/242). Schizoaffective disorder was later diagnosed (Exhibit 11F/76).</u> The record documents a three-day psychiatric admission for depression and suicidal ideation after attempting to jump out of a moving car at a time when her dog had recently died. Medications were adjusted (Exhibit 8F/5). <u>Treatment notes from</u>

34

> November 2018 reflect the claimant was overall feeling better and less depressed. Stuttering had improved. However, she still experienced intermittent symptoms of hopelessness and thoughts of self-harm especially after she impulsively spent a considerable amount of money acquiring a dog to replace the dog who recently died. Sleep was poor but she had not followed on fitting for a CPAP/BiPAP mask thinking it might be uncomfortable (Exhibit 11F/76).

(Tr. 22 (emphasis added).)

As outlined in Section II.B.1.i., *supra*, Ms. Martin did initiate psychiatric treatment with Dr. Cao in March 2018, and the ALJ's above analysis accurately accounts for the clinical findings at that visit. (*See* Tr. 1369-75.) The above discussion also accurately documents clinical findings and observations from Ms. Martin's November 2018 office visit with Dr. Cao. (*See* Tr. 1200-06.) But Ms. Martin is also correct that the ALJ's discussion does not address Ms. Martin's additional medication management visits with Dr. Cao in May 2018 (Tr. 1344-48), July 2018 (Tr. 1303-08), August 2018 (Tr. 1280-85), September 2018 (1249-54), and December 2018 (1178-83), all of which predate the date last insured. The ALJ also does not discuss any of her forty-six psychotherapy sessions with SWT Walters and LISW Spurling in 2018 (on March 14, 26, 28, April 3, 10, 24, 30, May 7, 10, 16, 22, 31, June 7, 11, 14, 21, July 5, 13, 23, 26, August 1, 8, 13, 17, 22, 28, September 5, 11, 20, 25, October 2, 12, 16, 18, 22, 26, 30, November 6, 7, 13, 19, 26, and December 4, 10, 20, and 31 (Tr. 1168-78, 1183-94, 1197-1200, 1208-48, 1254-80, 1285-1303, 1308-43, 1348-68, 1375-78)), except to generally note clinical findings of "mild impairment of insight and social judgment" (Tr. 23) and to acknowledge Ms. Martin's own testimony that "[s]he works with her counselor but the battle is ongoing" (Tr. 24). The ALJ also makes the following general statement without reference to specific records:

> While treatment and medication provide positive results, the record reflects exacerbation of symptoms resulting in suicidal ideation, hospital admissions and emergency room visits when she stops taking her medications, sometimes suddenly.

(Tr. 24.)

35

Of course, the ALJ was not required to discuss the details of every treatment record, so long as her decision reflected that she considered the evidence as a whole and reached a reasoned conclusion.  *See Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010) (finding an ALJ is not "required to discuss each piece of data in [her] opinion, so long as [she] consider[s] the evidence as a whole and reach[es] a reasoned conclusion") (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam) ("[a]n ALJ can consider all the evidence without directly addressing in [her] written decision every piece of evidence submitted by a party.") (citation omitted)).  Further, the inquiry required is whether the ALJ's findings as to the B criteria were supported by substantial evidence, not whether the evidence could possibly support greater impairment.  *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess: 'If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion.'") (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).

Nevertheless, the ALJ may not selectively highlight certain facts to support a finding of non-disability while ignoring evidence that points to a disability finding.  *See, e.g., Gentry v. Comm'r*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where ALJ failed "to address certain portions of the record, including the evidence of a continuing illness that was not resolved despite use of increasingly serious and dangerous medications"); *Minor v. Comm'r*, 513 F. App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 191 (6th Cir. 2009) (reversing where ALJ's finding that claimant "suffered no limitations was a clear mischaracterization of the facts").

36

Ultimately the undersigned finds that the ALJ's discussion of Ms. Martin's 2018 treatment, while technically correct as to the select records discussed, does not create a wholly accurate picture of her treatment.  The ALJ describes an initial treatment visit in March 2018 where Ms. Martin's main concerns were anxiety with panic attacks, depression, and stuttering, then discusses Ms. Martin's hospitalization for suicidal ideation in October 2018, and concludes with the November 2018 office visit where she reported improvement since her hospitalization. (Tr. 22.)  The ALJ thus creates an impression that Ms. Martin's struggles with suicidal ideation and self-harm emerged at the time of her October hospitalization and immediately improved with treatment.  This is certainly the implication of the ALJ's later statement: "While treatment and medication provide positive results, the record reflects exacerbation of symptoms resulting in suicidal ideation, hospital admissions and emergency room visits when she stops taking her medications, sometimes suddenly."  (Tr. 24.)

On the contrary, the findings and interventions detailed in the records but not discussed by the ALJ suggest that Ms. Martin struggled significantly with suicidal ideation and self-harm behaviors throughout her treatment in 2018, engaged in intensive treatment interventions with frequent psychiatric and psychotherapy visits, and complied with the recommendations of her providers.  Some examples of relevant findings in the 2018 treatment records include:

- Emergency therapy session for suicidal thoughts and cutting in May (Tr. 1340-43);

- Clinical findings of slowed behavior in May, July, August, November, and December (Tr. 1182, 1204, 1284, 1307, 1347);

- Clinical findings of moderately impaired social judgment in June, September, and October (Tr. 1229, 1248, 1319-22);

- Clinical findings of suicidal ideation with no intent throughout June, July, August, September, October, and December (Tr. 1186, 1190, 1204, 1237, 1248, 1257, 1260, 1264, 1269, 1272, 1276, 1280, 1288, 1292, 1296, 1319-22);

- Clinical findings of impaired concentration in August and October (Tr. 1222, 1280);

- Reports to Dr. Cao in July 2018 of increased flashbacks and panic attacks, pervasive sadness most days and increased frequency of suicidal ideation (Tr. 1306);

- Reports to Dr. Cao in August 2018 of pervasive sadness most days, chronic suicidal ideation, and holding a knife to her wrist the prior week (Tr. 1283); and

- Reports to Dr. Cao in September 2018 of pervasive sadness most days, chronic suicidal ideation, and self-harm by cutting within the past week, along with worsening anxiety with continued flashbacks and avoidance (Tr. 1251).

These abnormal findings persisted despite significant treatment interventions, ultimately leading up to Ms. Martin's October 2018 hospitalization following a suicide attempt. Further, the record reflects that these issues persisted after her hospitalization, with some signs of improvement.

The Commissioner is correct in observing that the ALJ relied on the opinions of the state agency psychiatric examiners in concluding that Ms. Martin had no more than moderate limitations in mental functioning. But the ALJ's discussion of those opinions does not shed further light on the basis for her conclusions, as she only explains that she finds the opinions consistent with the evidence and therefore persuasive. (Tr. 25.) The opinions themselves are no more instructive, as Dr. Dietz appears to have focused on the same two psychiatric treatment visits as the ALJ (March and November 2018), to the apparent exclusion of all other 2018 treatment records from that provider; it is not clear what (if any) of the 2018 treatment records were considered by Dr. Hill. (Tr. 114, 116, 122, 155, 161-63.)

Because neither the ALJ nor the state agency doctors acknowledged or addressed the full scope of Ms. Martin's comprehensive psychiatric treatment in 2018 and related clinical findings – most significantly, the findings and treatment relating to her pervasive sadness, self-harm behavior, and suicidal ideation – the undersigned lacks the information necessary to support a finding that the ALJ's determination at Step Three was supported by substantial evidence. The limited discussion and reasoning provided by the ALJ fails to build "an accurate and logical bridge" between the evidence and the result.

For the reasons set forth above, the undersigned recommends that the case be remanded so that the ALJ may provide a full and accurate explanation of the evidence and reasoning that forms the basis for her findings as to the paragraph "B" criteria discussed above, and assess whether the impairments meet Listings 12.04, 12.06, and/or 12.15 in light of that analysis.

## C.     Second Assignment of Error: Whether RFC was Supported by Substantial Evidence

In her second assignment of error, Ms. Martin argues the RFC was not supported by substantial evidence because the ALJ did not consider the combination of Ms. Martin's multiple physical impairments, including her obesity, lower extremity and hip pain, her mental health impairments, and her need for additional accommodations due to pain.  (ECF Doc. 7, pp. 19-23.) The Commissioner responds that the ALJ considered Ms. Martin's medically determinable impairments and articulated the reasons supporting her RFC assessment.  (ECF Doc. 8, pp. 10-13.)  As a result, she argues substantial evidence supports the ALJ's RFC determination. (*Id.*)

"In the Sixth Circuit, courts have held that 'an ALJ's finding that a claimant's combination of impairments (plural) did not meet or equal the Listings is sufficient to show that the ALJ had considered the effect of the combination of impairments,' so long as the ALJ has 'conducted sufficient analyses of each of the claimants' impairments after carefully considering the entire record.'"  *Malave v. Saul*, No. 1:18-CV-2747, 2019 WL 5552614, at *13 (N.D. Ohio Oct. 22, 2019), *report and recommendation adopted*, No. 1:18CV2747, 2019 WL 5552613 (N.D. Ohio Oct. 28, 2019) (quoting *Ridge v. Barnhart*, 232 F. Supp. 2d 775, 789 (N.D. Ohio 2002), *citing Gooch v. Sec'y of Health and Human Servs*., 833 F.2d 589, 592 (6th Cir. 1987); *Loy v. Sec'y of Health and Human Servs*., 901 F.2d 1306, 1310 (6th Cir. 1990)) (finding ALJ adequately considered combined effect of impairments; reversing on other grounds).)

39

Ms. Martin contends that the ALJ did not consider the combined effects of her impairments such as foot pain, knee pain, stuttering, leg pain, asthma attacks and anxiety, and obesity.  (ECF Doc. 7, pp. 19-20.)  However, a review of the ALJ's articulated reasoning discloses that she did consider these impairments when forming the RFC, as follows:

- "Obesity is a longstanding concern. The claimant's weight, mainly between 218 and 235 pounds [] has maintained a BMI between 44 and 46.1. Our rules recognize that the combined effects of obesity with other impairments such as impairments involving weight-bearing joints and pulmonary function may be greater than might be expected without the disorder. Accordingly, the undersigned has considered the cumulative effects the claimant's obesity played on her ability to function, and to perform physical activity within the work environment."  (Tr. 25 (citations omitted).)

- "Pulmonary function tests in July 2016 demonstrated no obvious hypersensitivities of the airways. Lung volumes appeared normal for her stature but diffusion capacity was mildly reduced likely secondary to obesity. Asthma seemed exercise-induced. FEV1 2.75L and FVC 3.30 L. FEV1/FVC 83. Symptoms controlled with Albuterol as needed, especially prior to exercise. In addition to exercise-induced asthma, she treats for obstructive sleep apnea, improved with the use of her CPAP. However, compliance is a concern."  (*Id.* (citations omitted).)

- "The claimant's physical impairments combined, compounded by the effects of obesity limit her exertional capacity, including the frequency of standing and walking she can do within an 8-hour workday limiting her to light exertion, further limiting climbing and postural limitations supported by the evidence of record. All physical impairments combined, compounded by the effects of obesity hinders the claimant's ability to move quickly to avoid falling or injury requiring a safe workplace free of hazards as described."  (*Id.*)

- "While the claimant drives as an activity of daily living, she should not engage in driving as a work task or operating pushing or pulling with the right leg, due to the residual symptoms of bilateral foot deformity."  (*Id.*)

- "Despite pain and discomfort in the feet, worse on the right, the claimant is able to walk with her dog, shop for groceries, do some homework and drive. The record supports limitations in prolonged standing, walking an assuming certain postures but fails to support the need to avoid prolonged sitting as reported in 2019, particularly in light of her testimony about how during the day she sits in silence or plays video games, draws and works on her tattooing skills."  (Tr. 24 (citations omitted).)

Ms. Martin notes that the ALJ did not mention the possible impact of Ms. Martin's urinary incontinence or interstitial cystitis on her other impairments (ECF Doc. 7, p. 21), but it is

noted that the ALJ did not find either of those impairments to be medically determinable at Step

Two of the sequential analysis, and Ms. Martin did not challenge that finding on appeal.  She has

therefore waived any argument as to whether those impairments were medically determinable.

Further, the ALJ specifically made the following finding with respect to all complaints and

diagnoses appearing periodically in Ms. Martin's treatment records:

> [A]ggressive treatment has not been recommended or anticipated for these
> impairments and there is no objective evidence to show that these impairments are
> more than transient or that they cause significant vocational limitations. The
> undersigned finds that they are not severe but accordingly has accounted for all
> impairments in the residual functional capacity as necessary taking into account the
> totality of the record.

(Tr. 20-21.)  The undersigned additionally observes that Ms. Martin's urology provider found no

signs of interstitial cystitis (Tr. 929) and her primary care provider recommended only kegel

exercises for her reported urinary incontinence (Tr. 918).

As to Ms. Martin's mental impairments, however, the undersigned concluded in Section

VI.B., *supra*, that the ALJ did not provide a full and accurate explanation of the evidence and

reasoning that forms the basis for her conclusion that Ms. Martin does not meet the criteria of

Listings 12.04, 12.06, and/or 12.15.  Because the undersigned has recommended that the case be

remanded for a more complete analysis of the evidence relating to Ms. Martin's mental

impairments, it is further recommended that the ALJ at that time consider what, if any, impact

that new analysis has on her consideration of Ms. Martin's combination of impairments.

For the reasons set forth above, the undersigned finds the ALJ considered the effects of

Ms. Martin's combination of physical impairments when forming the RFC, but that the ALJ has

failed to build "an accurate and logical bridge" between the evidence and her mental RFC

findings.  Accordingly, the undersigned recommends that the case be remanded so that the ALJ

can provide a full and accurate explanation of the evidence and reasoning supporting her RFC.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **VACATED** and that the case be **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation. On remand, the ALJ should: (1) provide a full and accurate explanation of the evidence and reasoning that forms the basis for her findings as to the paragraph "B" criteria Listings 12.04, 12.06, and/or 12.15, including clear and complete consideration of Ms. Martin's treatment records with the RHC Psychiatry Clinic through December 31, 2018; (2) reassess whether Ms. Martin meets the specified Listings in light of that analysis; and (3) provide a full and accurate explanation of the evidence and reasoning that forms the basis for her mental RFC limitations.

May 31, 2023

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).